[No. A035279. First Dist., Div. Three. Nov. 27, 1989.]

ELMORE DUFFY et al., Individually and as Trustees, etc., Plaintiffs, Cross-defendants and Respondents, v.
KING CAVALIER et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Certified for publication except as to parts VII and VIII. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Tod L. Gamlen, Robin L. Filion and Baker & McKenzie for Defendants, Cross-complainants and Appellants.

Howard M. Hoffman for Plaintiffs, Cross-defendants and Respondents.

**OPINION**

**BARRY-DEAL, J.**—This appeal by King Cavalier (Cavalier), Lehman Brothers Kuhn Loeb, Inc. (Lehman Brothers), together with Shearson Lehman/American Express, Inc., and Shearson Lehman Brothers, Inc., the successor corporations to Lehman Brothers, is from a judgment entered on a jury verdict finding that appellants had breached their fiduciary duties to respondents Elmore Duffy (Duffy), Frank Ghilarducci (Ghilarducci), and Walter Chokan (Chokan), trustees of the Capital Wholesale Electric Company (Capital Wholesale) Profit Sharing and Trust Fund (the profit-sharing plan), in their handling of a stock brokerage account. We previously considered this appeal and affirmed the judgment in an opinion filed on May 31, 1989. Thereafter, in a petition for rehearing, appellants raised for the first time the argument that respondents' entire action was preempted by the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.). After carefully considering this newly raised issue, we denied the petition for rehearing. On September 5, 1989, our Supreme Court granted appellants' petition for review and transferred the matter to us "with directions to vacate [our] opinion and to consider whether this action is preempted by [ERISA]." In compliance with the directive of the Supreme Court, therefore, we have again considered the issue of preemption. Our conclusion remains the same. We therefore again affirm the judgment.

I

Capital Wholesale is a supplier of electrical materials. Duffy was employed by Capital Wholesale since 1952, starting out as a vice-president, becoming president in 1960 and chairman of the board in 1975. At the time

of trial, Ghilarducci was president, and Chokan was vice-president of Capital Wholesale; all three were participants in the profit-sharing plan.

In 1960, Capital Wholesale instituted a profit-sharing plan. The purpose of this plan was to share company profits with, and to provide for the retirement security of, Capital Wholesale's employees. Capital Wholesale made contributions of profits to a trust fund, which in turn were invested. The initial trustee of the profit-sharing plan was the Wells Fargo Bank. In 1963, Duffy, Ghilarducci, and Chokan became the trustees in place of Wells Fargo Bank.

When Duffy became the chairman of the board, he became the trustee principally involved in managing the profit-sharing plan and handling the trust fund's investments. At the outset, the profit-sharing plan funds were invested in real estate and in some stocks and bonds. In 1977, Duffy expressed an interest in options to Kidder Peabody & Co., Inc., which in turn asked Duffy to obtain a letter from an attorney approving of such investments by the profit-sharing plan. Around August 1977, Duffy asked Thomas E. Smail, Jr., the attorney for the profit-sharing plan, for a legal opinion as to whether it would be permissible for the profit-sharing plan to invest in options. In response, Smail warned Duffy about the risks of trading in stock options. Nevertheless, around June 1978, the trust agreement establishing and governing the profit-sharing plan was amended to permit investments of trust fund monies in options, commodities, and futures.[1]

Duffy began to ask stockbrokers if they would trade in options for him on behalf of the profit-sharing plan. At least one brokerage house would not permit him to trade in options; others permitted him to do so. He first traded in options on the profit-sharing plan's account in September 1978. By the end of 1979, Duffy had purchased over $300,000 worth of options and sold over $200,000 worth in the profit-sharing plan's Kidder Peabody account alone; in addition, he had already purchased approximately $60,000 in options in an account with Paine Webber. At that point, the profit-sharing plan's losses amounted to approximately $133,000, with profits of about $90,000.

---

[1] Although Duffy testified that he was aware of what options were, and of the risks of investing in them, he also stated his opinion that "[c]ommodities and futures and options in the hands or in the possession of an expert could be less risky than an inexperienced person dealing in common stocks." According to Duffy, trading in commodities and options was risky "[o]nly to the degree that we don't have the expertise." Conceding that options are not assets in and of themselves and that they must be traded on or before a certain date or they will expire worthless, Duffy stated that he embarked on the investment of profit-sharing plan funds in options because he wanted "to increase the profitability of the profit-sharing plan."

Cavalier first joined Lehman Brothers as a "registered representative," or stockbroker, in March 1978. In October or November 1979, Cavalier contacted Duffy by telephone to solicit him as a client.

At this point, the parties' versions of the facts diverge sharply. Duffy testified that Cavalier was already aware of the profit-sharing plan at the time that he first called and represented himself as an expert and specialist in options. According to Duffy, Cavalier never proposed an investment in stocks, as distinguished from options; instead, Cavalier solicited the business of the profit-sharing plan for trading exclusively in options. Cavalier, on the other hand, testified that he did not consider himself an expert on options, that he never represented himself as such, and that he was unaware of the profit-sharing plan at the time of his first brief introductory telephone call to Duffy as an individual "prospect." According to Cavalier, Duffy emphatically stated that "he had absolutely no interest in buying stock," and insisted that he wanted to trade in options only on the profit-sharing plan. Cavalier testified that when he told Duffy that he "had never seen a trust agreement that allowed for the trustees to trade options in it," Duffy told him that the trust agreement had been amended to permit the profit-sharing plan to trade options "or anything else they wanted." Cavalier allegedly did his "level darndest to discourage" Duffy from trading in options, telling Duffy that options were not "appropriate" for a profit-sharing plan, that they were too risky, that they expired worthless unless traded, and that four out of five option trades resulted in losses; he then told Duffy that he would only make recommendations as to stocks, and that "[i]f [Duffy] wanted to trade options, that was his business."

At some point, the subject of discretionary authority was raised and discussed. According to Duffy, an individual identifying himself as Cavalier twice visited Duffy in the latter's office, on or about November 19 and December 3, 1979. This individual gave Duffy blank application forms for a Lehman Brothers' client option account and a business card bearing the name "King Cavalier," told Duffy that he needed the forms signed in order to open an options account at Lehman Brothers, and said that he only traded in options and was in a better position to monitor the volatility in options accounts than his clients could be. Duffy signed the forms, obtained the signatures of the other two trustees, and returned the forms to the individual. During his second visit to Duffy's office, this individual told Duffy that he needed a letter from the trustees authorizing him to handle the profit-sharing plan's account on a discretionary basis, which was the only way that he could handle the account because "he had to have the ability to make decisions." Duffy testified that he had never heard the term "discretionary authority" before this. According to Duffy, the letter, dated December 3, 1979, was typed and given to the individual while he was in

Duffy's office. According to Duffy, he never discussed the nature and risks of options trading with Cavalier or anyone else from Lehman Brothers at any time.[2]

Cavalier denied ever visiting Duffy in Sacramento, or sending anyone else to visit him; he denied telling Duffy that he only handled accounts on a discretionary basis; and he denied ever requesting the trustees' December 3, 1979, letter authorizing him to handle the profit-sharing plan's account on a discretionary basis. He testified that this letter "just came in the mail one day," unsolicited. According to Cavalier, the subject of discretionary authority was raised by Duffy in a telephone conversation on November 15, 1979. Cavalier, who had no other discretionary accounts, tried to discourage the idea. Cavalier testified that he went over the Lehman Brothers' new account and option account application forms with Duffy over the telephone, and then mailed them to Capital Wholesale, where the trustees of the profit-sharing plan signed them. On the client option account application executed by the individual trustees, the available "investment assets" of the profit-sharing plan were stated to be $2 million. Cavalier gave these documents to his supervisor, Robert Glavor, to review.

Coincidentally, on December 4, 1979, Lehman Brothers made the initial deposit in respondents' account by depositing a cashier's check dated November 21, 1979, in the amount of $50,000 from the trust. Cavalier testified that after receiving notification of the receipt of the check and discussing it with Duffy, he purchased 50 Inexco call options on the profit-sharing plan's account the same day. A series of options transactions occurred thereafter in the profit-sharing plan's account with Lehman Brothers. According to Cavalier, each of these transactions was made only after consulting with Duffy over the telephone, with the single exception of the sale of the Inexco call options on December 6, 1979, which was made only after an unsuccessful attempt to reach Duffy. That particular transaction resulted in a net profit of $2,432; subsequent transactions had mixed results, but primarily ended in losses for the profit-sharing plan.

Cavalier testified that on December 14, 1979, he telephoned Duffy to inform him that Lehman Brothers would not accept discretionary authority in the profit-sharing plan's account. Duffy gave Cavalier his home telephone number in order to facilitate Cavalier's ability to reach him thereafter.

---

[2] Duffy testified that the man who came to his office on November 19 and December 3, 1979, and who identified himself as Cavalier, was *not* the same person as the individual identified at trial as in fact being appellant Cavalier. When asked whether he could recall if the person he had twice met with appeared to have the same voice as the person (also identified as Cavalier) with whom he spoke on the telephone, Duffy testified, "No, I couldn't connect the two."

Thereafter, Cavalier testified, he exercised no "true" discretion in the profit-sharing account. Nevertheless, he continued to mark many of the order tickers for trades on the account with a "D" for "discretionary."

On February 22, 1980, Cavalier telephoned Duffy to tell him that Lehman Brothers' research department considered Reynolds Metals a "number one pick," and that the price of both its stock and stock options was higher. At that point, the profit-sharing plan had already purchased 70 Reynolds Metals call options. Cavalier recommended that the profit-sharing plan increase its investment in the options; he asked Duffy if the profit-sharing plan could afford an additional $60,000 investment. Duffy responded affirmatively and sent Cavalier an additional $60,000 from the profit-sharing plan to invest in 100 additional Reynolds Metals call options. Cavalier proceeded to purchase these options on February 22 and 25, 1980.

Duffy testified that although he was "sure" he had telephone conversations with Cavalier in which they discussed the performance of the account, he kept no notes of them and could not recall anything about them until Cavalier telephoned him in February 1980 to request additional funds for the purchase of Reynolds Metals call options. According to Duffy, he agreed to send Cavalier an additional $60,000 for the purchase of the Reynolds Metals call options not knowing that Cavalier had already purchased 70 such options.

At the time that Cavalier solicited this large additional purchase of Reynolds Metals call options in late February 1980, the profit-sharing plan's entire account at Lehman Brothers was invested in 10 Standard Oil of California call options and 70 Reynolds Metals call options. As of March 20, approximately one month later, these investments were rapidly declining in value. On or about March 20, Cavalier telephoned Duffy and recommended that the profit-sharing plan sell all the call options in both Reynolds Metals and Standard Oil of California, and "take the loss" in the account before the value of the options dropped any further. According to Cavalier, Duffy told him to sell only the 10 Standard Oil of California call options; despite Cavalier's warnings, Duffy wanted to hold on to the Reynolds Metals options in the hope that the market would recover. Although Duffy was not able to recall exactly what was said in this telephone conversation, he testified that it was the first time he learned that almost all the profit-sharing plan's account was invested in Reynolds Metals call options, and that Cavalier gave him no explanation for why he had not "cut the trust fund's losses" as the value of the options fell.

Thereafter, the value of the Reynolds Metals options continued to drop until they expired worthless, resulting in a loss of $88,730. Cavalier testified

that he could do nothing about this because Duffy had instructed him not to trade the options, and he had no discretion to do otherwise. Lehman Brothers, determining that there were insufficient funds in the account for it to remain active, returned the remaining funds in the amount of $7,788.25 to respondents.

Respondents filed suit against Cavalier and Lehman Brothers on December 2, 1982. The initial complaint included a cause of action based on ERISA, alleging that appellants had violated their fiduciary responsibilities under that act. Appellants demurred, alleging that "in this case [respondents'] claims have no relationship to the Congressional intent behind ERISA."[3] The trial court granted appellants' demurrer to this cause of action. Respondents then filed a first amended complaint containing a more expanded ERISA cause of action. Appellants again demurred, on the same grounds as before. The trial court sustained the demurrer to the cause of action based on ERISA without leave to amend.[4]

Thereafter, the case went to trial on the issues of intentional misrepresentation and breach of fiduciary duty. The jury found against appellants on breach of fiduciary duty. Respondents were awarded $45,000 in compensatory damages, plus punitive damages in the amounts of $250,000 against Lehman Brothers and $8,200 against Cavalier.

In their appeal from the judgment entered on the jury verdict, appellants argued that the trial court made certain instructional errors regarding the existence and extent of a stockbroker's fiduciary duty to customers, that there was insufficient evidence to support the verdict, and that a number of evidentiary errors were made. In a decision filed on May 31, 1989, this court affirmed the judgment.

[3] Appellants' arguments in their demurrers are of interest and merit quotation, particularly in light of their current contentions. Thus, in the memorandum of points and authorities in support of their first demurrer, filed on February 11, 1983, appellants stated: "[Respondents] are not contending that the [profit-sharing] *plan* has in any way been mismanaged; indeed, [respondents] are the ones responsible for such administration. As in *Lederman* [v. *Pacific Mut. Life Ins. Co.* (C.D.Cal. 1980) 494 F.Supp. 1020], [respondents] are merely asserting a claim against a third party who, at most, contracted with the trustees of the plan; however, such claim are [*sic*] not the concern of ERISA." Appellants then went on to argue that respondents had no standing to sue under the remedial provisions of ERISA found at 29 United States Code section 1132(a). Needless to say, appellants take the opposite position now.

[4] In their second demurrer, appellants made the same arguments as before: namely, that only complaints about the "fairness, funding or administration" of a profit-sharing plan, directed against either the employer that established the plan or the trustee that administered it, were cognizable under ERISA, and that complaints against "third part[ies]" who had "contracted with the trustees of the plan" were not. (Italics omitted.) In addition, appellants argued that respondents' first amended complaint did not make sufficient allegations of fact to establish that the profit-sharing plan was covered by ERISA or that respondents had standing to sue under the enforcement provisions of ERISA.

Appellants filed a petition for rehearing on June 15, 1989. For the first time in this appeal, this petition raised the argument that the underlying action is preempted by ERISA.[5] After this court denied the petition for rehearing, the Supreme Court granted appellants' petition for review and sent the appeal back to us with directions to vacate our previous opinion and consider the issue of preemption.

## II

We therefore turn first to the question of whether this appeal is preempted by ERISA, thus depriving us of jurisdiction.

It is not disputed by respondents that the profit-sharing plan in this case is an " 'employee benefit plan' " covered by and within the terms of ERISA (29 U.S.C. § 1002(1)-(3)). ▆ It is well established that ERISA comprehensively regulates employee pension and welfare plans, and that in the area of its coverage it preempts state laws and regulations. (29 U.S.C. §§ 1001(b), 1144(a); *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 44-45 [95 L.Ed.2d 39, 46, 107 S.Ct. 1549]; *Commercial Life Ins. Co.* v. *Superior Court* (1988) 47 Cal.3d 473, 476-477 [253 Cal.Rptr. 682, 764 P.2d 1059].) ERISA's preemption clause declares that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." (29 U.S.C. § 1144(a).) However, it is also clear that there is a presumption *against* preemption, and that while ERISA's preemptive effect is broad, it is not all-encompassing. (*Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 739-740 [85 L.Ed.2d 728, 740, 105 S.Ct. 2380]; *Commercial Life Ins. Co.* v. *Superior Court, supra,* 47 Cal.3d at p. 478; *Pacific Airmotive Corp.* v. *First Interstate Bank* (1986) 178 Cal.App.3d 1130, 1135 [224 Cal.Rptr. 233]; *Scott* v. *Gulf Oil Corp.* (9th Cir. 1985) 754 F.2d 1499, 1504-1505; *Lederman* v. *Pacific Mut. Life Ins. Co.* (C.D.Cal. 1980) 494 F.Supp. 1020, 1022.) As the Supreme Court has stated, "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan. . . ." (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 100, fn. 21 [77 L.Ed.2d 490, 503, 103 S.Ct. 2890].)

---

[5] Although respondents had originally based their action, in part, on ERISA, appellants had successfully argued in their two demurrers that respondents' claims were not covered by ERISA and they had no right of action under that federal statute. Thus, aside from the fact that the argument was not raised either in appellants' briefs on appeal or at oral argument, appellants' current argument that respondents' claims are covered by and *completely preempted* by ERISA has never been raised *at any time* in this litigation.

Appellants have given this court no explanation whatsoever for their failure to raise the ERISA preemption issue prior to filing their petition for rehearing. As the record of this case clearly shows, appellants were fully aware of this issue. If appellants delayed raising the issue for purely tactical reasons, as we must assume, they have committed an unconscionable abuse of this court's limited time and judicial resources.

Although there is no simple, "black letter" test for evaluating whether a state law of general application affects employee benefit plans in a manner too tenuous, remote, or peripheral to be preempted, some determining factors have been set forth in the cases. Among other things, the courts have considered whether the state law in question concerns an area traditionally within the state's domain and authority; whether plaintiffs are complaining about something impinging on the *administration* of an employee benefit plan, such as its terms and conditions, funding, vesting, establishment, reporting, disclosure, enforcement, fairness, or distribution of benefits; and whether the controversy affects *relations among the principal ERISA entities*—the employer, the plan participants and beneficiaries, the plan trustees and fiduciaries, and the plan itself—rather than between one or more of these entities and outside parties who have only incidental connections with the plan. (*Pacific Airmotive Corp.* v. *First Interstate Bank, supra,* 178 Cal.App.3d at pp. 1136-1141; *Sommers Drug Stores* v. *Corrigan Enterprises, Inc.* (5th Cir. 1986) 793 F.2d 1456, 1465-1470; *Scott* v. *Gulf Oil Corp., supra,* 754 F.2d at p. 1505; *Lederman* v. *Pacific Mut. Life Ins. Co., supra,* 494 F.Supp. at p. 1022.)

■ With regard to the particular circumstances before us, respondents' claims against appellants do not impinge directly or indirectly on the administration of the profit-sharing plan. Respondents are not seeking to assert a claim for any rights, benefits, or coverage under the plan; nor do they seek relief which could have the effect of altering, modifying, amending, or affecting the profit-sharing plan in any way.[6] Respondents, as trustees and fiduciaries of the profit-sharing plan, are responsible to the plan for the losses caused by their mismanagement of plan funds; they have in fact already been required to reimburse the plan in a separate proceeding. The profit-sharing plan will be *totally unaffected* by this suit and this appeal.[7] The issues raised by respondents' claim are no different from those

---

[6] This, of course, distinguishes this case from *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. 41, and *Commercial Life Ins. Co.* v. *Superior Court, supra,* 47 Cal.3d 473, both of which cases involved claims by participants or beneficiaries of employee benefit plans for benefits due them under their plans. "Thus, each of these cases presents the classic example of how a general state law 'relates to' an employee benefit plan: when it is being used to obtain contested benefits under the plan. [Citation.]" (*Pacific Airmotive Corp.* v. *First Interstate Bank, supra,* 178 Cal.App.3d at p. 1138.)

[7] In this respect, the facts in this case are closely parallel to those in *Pacific Airmotive Corp.* v. *First Interstate Bank, supra,* 178 Cal.App.3d 1130, in which the plaintiff (the employer) sued the bank, trustee of the employer's employee benefit plan, for breach of fiduciary duty and damages incurred by the employer as a result of the bank's failure properly to carry out its reporting duties regarding the assets in the plan. As a result of the bank's reporting failure, the employer itself had been required to reimburse the plan's assets. The plan was not a party to the lawsuit against the bank and would be unaffected by its outcome. The Court of Appeal held that the employer's cause of action for breach of fiduciary duty against the bank/trustee was not preempted by ERISA.

that might be raised by any other client of appellants who reasonably relied on their advice and handling of a securities account. (Cf. *Pacific Airmotive Corp.* v. *First Interstate Bank, supra,* 178 Cal.App.3d at p. 1139; *Scott* v. *Gulf Oil Corp., supra,* 754 F.2d at p. 1505.)

Neither does the controversy in this case affect relations among the principal ERISA entities. The fiduciary duty that respondents invoke here centers upon the relation between a stockbroker and his or her client or customer. It is, in its essence, an *agency* relationship, traditionally established and regulated by state common law. A stockbroker's duty, like that of any agent, arises from his or her status as the agent of his or her principal. The duties at issue here are imposed by virtue of appellants' capacity as stockbrokers only, not their relationship with the employee benefit plan of which respondents are the trustees. Similarly, respondents' rights against appellants arise solely from their status as customers. The fact that respondents happen to be the trustees of an employee benefit plan does not create the fiduciary duty that appellants owe to them; that duty exists *independently* of the involvement of the profit-sharing plan here. In short, the state law we consider here does not affect relations between an ERISA fiduciary and an employee benefit plan or plan beneficiaries *as such;* it affects them in their entirely *separate capacities* as stockbroker and customer. (Cf. *Sommers Drug Stores* v. *Corrigan Enterprises, Inc., supra,* 793 F.2d at p. 1468.)

Respondents' claims against appellants do not affect any interest protected by ERISA. We are not required to interpret any provisions of ERISA, other than those relating to preemption, or to rule on the validity of any terms and conditions of the profit-sharing plan. This lawsuit simply does not affect in any way the benefits of participants or beneficiaries under the plan, nor does it infringe upon the interests in uniformity and supremacy of federal pension policy. (*Shaw* v. *Delta Air Lines, Inc., supra,* 463 U.S. at pp. 99-100, fn. 20 [77 L.Ed.2d at p. 502]; *Pacific Airmotive Corp.* v. *First Interstate Bank, supra,* 178 Cal.App.3d at p. 1141.)

We conclude that the state common law of stockbroker fiduciary duty, as applied in this case, affects employee benefit plans in too tenuous, remote, and peripheral a manner to warrant a finding that it "relate[s] to" the plans. The state law is one of general application; it imposes a duty on all stockbrokers, regardless of the identity of their customers, and it runs in favor of all customers of stockbrokers, including employee benefit plans. It does not affect relations among the principal ERISA entities—the employer, the plan fiduciaries, the plan beneficiaries, and the plan—*as such,* but only in their *independent capacities* as stockbroker and stock customer. The state law does not conflict with or impinge on duties imposed or interests protected by ERISA. We hold, therefore, that ERISA does not preempt this action.

## III

We turn now to the substantive issues of California law raised by this appeal. Appellants' arguments are premised on the contention that, contrary to long-established California law, a stockbroker owes no fiduciary duty to a customer who is a "sophisticated" investor unless the stockbroker actually "controls" the investor's account. Closely allied to this legal premise is appellants' corresponding factual contention that Duffy was a "sophisticated" investor who either understood the risks of the options in which he was investing or who reasonably should have, and who "controlled" his accounts because he had sufficient intelligence, experience, and understanding to evaluate the stockbroker's recommendations and to reject any which were unsuitable. Neither of these legal and factual premises has any merit.

The leading California case on the issue of a stockbroker's fiduciary duty is *Twomey* v. *Mitchum, Jones & Templeton, Inc.* (hereafter *Twomey*) (1968) 262 Cal.App.2d 690 [69 Cal.Rptr. 222]. In *Twomey,* a widow brought suit against an individual stockbroker and the firm for which he worked, alleging, inter alia, breach of fiduciary duty in the handling of her account. The evidence showed that the plaintiff widow had had some previous experience in the stock market prior to the events in question; she had made previous transactions with other brokers, and had improvidently invested in one speculative security on her own initiative and against the advice of the defendant stockbroker. She subsequently brought her portfolio of securities to the defendant stockbroker and asked what she should do with them; he advised her to sell everything at a loss, give him the money, and let him invest it for her or advise her what to buy, assuring her that such a course was prudent because he could make up her losses, obtain " '. . . a good solid income and make more money . . .' " for her. The widow told the stockbroker that the funds she was giving him were " 'nonreplaceable.' " Subsequently, the defendant stockbroker telephoned the widow almost daily to discuss transactions, and she followed his recommendations every time. She received confirmation slips for each transaction, which she read but did not always understand. Most of the stocks purchased by the defendant stockbroker on the plaintiff widow's account were speculative, and there was an excessive frequency in trades on the plaintiff's account. (*Id.,* at pp. 712-720.)

On appeal, this court affirmed the judgment, concluding that there was sufficient evidence to support the trial court's finding that " 'the defendants . . . were acting in a confidential and fiduciary capacity towards plaintiff [widow] and that each of them breached said duty towards plaintiff . . . [.]' " (*Twomey, supra,* 262 Cal.App.2d at pp. 712, 714.) The principles applicable under the facts of *Twomey* are equally controlling here.

The *Twomey* court's statement of the extent of a stockbroker's fiduciary duty is as clear as it is broad. " 'Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. . . .' [Citations.] . . . 'An agent is a fiduciary. His [or her] obligation of diligent and faithful service is the same as that imposed upon a trustee. [Citations.]' [Citations.] 'The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith toward the principal. [Citations.]' [Citations.] With respect to stockbrokers it is recognized, 'The duties of the broker, being fiduciary in character, must be exercised with the utmost good faith and integrity.' [Citations.]" (*Twomey, supra,* 262 Cal.App.2d at pp. 708-709.)

The defendants in *Twomey,* like appellants in this case, argued that their fiduciary obligation to the customer could not be measured by the duties owed by a stockbroker to a discretionary account, "because each transaction was authorized by a telephone conversation, and was confirmed in writing without objection" by the plaintiff. (*Twomey, supra,* 262 Cal.App.2d at p. 717.) The appellate court rejected this argument, concluding that the plaintiff customer's testimony supported the trial court's findings that the individual stockbroker and his employer "were acting as financial advisors to plaintiff and that the plaintiff placed great trust and confidence in them and relied upon them . . . . The trial court was entitled to look at the substance and not the form of the transaction in determining the duty owed by defendants to plaintiff . . . . [Citations.]" (*Ibid.*)

Similarly, the defendants in *Twomey* argued that there was nothing untoward about the manner in which the plaintiff customer's account was handled, if it were considered in the light of the objective of trading to secure capital gains and profits. (*Twomey, supra,* 262 Cal.App.2d at p. 717.) This court responded that the propriety of the defendants' handling of the account "appears to revolve about the question of whether it was proper to advise, encourage and execute such an objective for a customer with the plaintiff's resources and needs. On this basis the unsuitability of the securities selected for purchase colors the dealings between plaintiff and defendants, and supports the finding that 'there was excessive trading in view of the plaintiff's financial position and in view of the size of plaintiff's account.' " (*Id.,* at p. 718.)

The *Twomey* defendants "contended that the sole obligation of the broker-dealer is to carry out the stated objectives of the customer." (*Twomey, supra,* 262 Cal.App.2d at p. 719.) This court pointed out that "[t]his may well be true when the broker is acting merely as agent to carry out purchases or sales selected by the customer, with or without the broker's

recommendation. Here, however, there is evidence to sustain the finding that [the stockbroker's] recommendations, as invariably followed, were for all practical purposes the controlling factor in the transactions. Under these circumstances, there should be an obligation to determine the customer's actual financial situation and needs. [Citations.] If, as appears from the evidence and as found by the court, it was improper for [the plaintiff customer] to carry out the speculative objectives which defendants attribute to her (but which her testimony does not fully admit), there was a further obligation to make this known to her, and refrain from acting except upon her express orders. [Citations.]" (*Id.,* at p. 719.)

Appellants contend that *Twomey* only addresses the fiduciary duty owed by a stockbroker to an "unsophisticated" investor, and does not address "the issue of the extent to which a fiduciary duty is owed by a broker to a *sophisticated* investor such as Duffy." Our own analysis of *Twomey* persuades us that appellants are incorrect. In fact, the *Twomey* court considered at considerable length the question of the degree to which a customer's relative sophistication, if any, affects the stockbroker's fiduciary duty.

In an analysis highly pertinent to this appeal, the *Twomey* court considered the hypothetical case " '. . . involving the "sweet trusting widow" who turns out to be a "greedy old lady." . . .' " (*Twomey, supra,* 262 Cal.App.2d at p. 720.) The court concluded that where an apparently unsophisticated investor expresses a desire to engage in speculative investments with the objective of making large profits, the stockbroker cannot simply carry out the customer's wishes. Rather, the stockbroker has a *fiduciary duty* (1) to ascertain that the investor understands the investment risks in the light of his or her *actual* financial situation; (2) to inform the customer that *no* speculative investments are suitable if the customer persists in wanting to engage in such speculative transactions without the stockbroker's being persuaded that the customer is able to bear the financial risks involved; and (3) to refrain completely from *soliciting* the customer's purchase of any speculative securities which the stockbroker considers to be beyond the customer's risk threshold. As long as these duties are met, if the customer nevertheless insists on purchasing speculative securities, the stockbroker is not barred from *advising* the customer about various speculative securities and purchasing for the customer those securities which the *customer* selects. (*Id.,* at p. 721.)[8]

---

[8] "The controversy in this case is paralleled by the examples . . . of the 'greedy old lady' posing as the 'sweet trusting widow.' [Citation.] . . . '. . . Typically, the "sweet trusting widow" has opened an account with an investment objective stressing conservation of capital and stability of income. At some point—and for various reasons—she asks for recommendations of a speculative nature which will permit her to become rich quickly. . . . [T]he broker-dealer cannot, without more, act on her announced change in investment objective. The

As in this case, the defendants in *Twomey* argued that the plaintiff customer was actually a "sophisticated" investor, pointing to evidence "that she understood that there was a risk, that she knew securities could go down as well as up, and that she understood that defendants were not going to make good her losses, or guarantee her a profit." (*Twomey, supra,* 262 Cal.App.2d at p. 722.) The court concluded that these facts did not compel the conclusion that she was "competent to evaluate the extent of the risk she was taking or the propriety of one of her financial condition so doing. The fact that she had . . . prior transactions with other brokers, and that she had improvidently invested in one speculative security on her own initiative might justify a finding of knowledgeableness and lack of reliance, but they do not compel that result . . . . The receipt of confirmation slips and accounts, and her ability to chart the cost and prices of her securities are facts of the same tenor. They may permit, *but they do not compel,* findings that plaintiff knew she was engaged in a course of trading and purchasing securities of a type that were unsuitable for one of her financial situation and needs. The daily calls from [the stockbroker] only have significance if she was exercising some judgment herself. The trial court concluded to the contrary that she was relying on his judgment." (*Id.,* at p. 722, italics added.)

*Twomey* remains the controlling statement of the law applicable to this case. ■ Contrary to appellants' position, the relationship between a stockbroker and his or her customer is fiduciary in nature; the distinction between a "sophisticated" investor and an "unsophisticated" one is not controlling in this regard.

---

problem is similar to that which occurs when a customer opens an account and the broker-dealer helps him [or her] to decide on the proper investment objective. . . . [T]he broker-dealer must assume the responsibility for ascertaining that the widow understands the investment risks involved in her changed objective. These risks should be explained by the broker-dealer in the light of her financial situation as known to [the broker-dealer]. The conversation between the broker-dealer and the widow may result in: (1) The widow's return to her old investment objectives. In this case she would not purchase any of the speculative securities she initially demanded. (2) The widow's adherence to her changed investment objective with the broker-dealer persuaded that she is able to bear the risks inherent in the new investment objective. In this case he [or she] should be permitted to recommend those speculative securities which he [or she] thinks are appropriate. (3) The widow's adherence to her changed investment objective without, however, the broker-dealer being persuaded that she is able to bear the risks inherent in the new investment objective. In this case the broker-dealer should be required to inform the customer that no speculative securities are suitable for her. If, nevertheless, she insists on purchasing such securities, the broker-dealer should be allowed to advise her about various speculative securities and purchase for her the ones which she selects. *However, [the broker-dealer] should not, as long as he [or she] thinks that the securities are beyond [the widow's] risk threshold, be permitted to solicit her purchase of any such speculative securities.' "* (*Twomey, supra,* 262 Cal.App.2d at pp. 720-721, italics added.)

## IV

Appellants argue that the trial court erred in refusing to give two proposed jury instructions on the issue of whether they owed a fiduciary duty to respondents.[9] We are of the opinion that, first, appellants' proposed jury instructions are misleading, and *not* an accurate statement of the law; and, second, the jury instructions actually given by the trial court were correct, in accordance with all applicable law, and sufficiently addressed the issues raised in such a way as to protect appellants from prejudice.

■ Appellants' proposed jury instruction No. 39 is, on its face, clearly an incorrect statement of law. Contrary to appellants' formulation, the existence of a stockbroker's fiduciary duty to a customer does not depend on a showing of "special facts," including whether or not the stockbroker serves as an investment adviser or controls the account. Stockbrokers act as agents for buyers and sellers of securities. *Any* agent is also a fiduciary, whose obligation of diligent and faithful service is the same as that of a trustee. (Civ. Code, § 2322, subd. (c); Rest.2d Agency, § 13; *Twomey, supra,* 262 Cal.App.2d at p. 709; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, §§ 41, 287, pp. 53, 284-285.) As repeatedly stated in *Twomey* and the many subsequent cases following it, the relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer. (*Twomey, supra,* 262 Cal.App.2d at p. 709; *Hobbs* v. *Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 201 [210 Cal.Rptr. 387]; 2 Witkin, *op. cit. supra,* at § 287, p. 285.)

Appellants insist that recent federal cases have limited the scope of a stockbroker's fiduciary duty to instances in which it can be proven that the broker actually controlled the account. We disagree. In our opinion, appellants have misread these cases, which are not in conflict with *Twomey* and

---

[9] The requested instructions read as follows: "*[Appellants'] Proposed Jury Instruction No. 39* [¶] A stockbroker is not a fiduciary to a customer unless special facts are shown. A stockbroker assumes a fiduciary relationship with a customer if the stockbroker serves as an investment adviser and controls the account. [Citations.]"

"*[Appellants'] Proposed Jury Instruction No. 39(a)* [¶] In determining if a broker 'controls' an account you should consider whether or not the customer has sufficient knowledge and understanding to evaluate the broker's recommendations and to reject one when he thinks it unsuitable. Generally, if a broker does not exercise discretion then the customer retains control. And the mere fact that a broker made all the initial calls and recommendations does not indicate the broker had control. A nonprofessional investor's routine reliance on a broker's recommendation is not evidence of control because the investor typically engages a broker precisely to receive such recommendations, knowing that the broker has greater access to pertinent financial information. So long as the customer is of sufficient intelligence and understanding to make the ultimate investment decision, the customer controls the account. [Citations.]"

its progeny. The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the *scope or extent* of the fiduciary obligation, which depends on the facts of the case.

Thus, in *Leboce, S.A.* v. *Merrill Lynch, Pierce, Fenner, etc.* (9th Cir. 1983) 709 F.2d 605, the plaintiff (Leboce) was a foreign investment holding company which placed an unsolicited order with the defendant stockbrokerage to sell its extensive shares of an over-the-counter stock. The stockbrokerage itself purchased the stock and then began to resell the shares to other purchasers at a small profit. Leboce sued for the subsequent profits earned on resale of the stock, claiming that the stockbrokerage had a fiduciary duty to disclose its intent to purchase the shares prior to acting on the customer's order to sell. The following facts were controlling: Leboce did not rely on the brokerage in making its decision to sell; the sale was unsolicited; the brokerage fully disclosed to Leboce the fact that it had purchased the shares; Leboce's investments were managed by a professional investment consultant who dealt on Leboce's behalf with all the various brokerages with which Leboce maintained accounts; and the brokerage had no authority to make trades on Leboce's account. The federal court of appeals affirmed the district court's judgment for the brokerage, holding that the brokerage's duties to its customer "were limited by the narrow extent of its agency," which was "strictly limited" to selling the stock on the customer's order at the best available price and for a reasonable commission. (*Id.,* at pp. 607-608.)

Similarly, in *Caravan Mobile Home Sales* v. *Lehman Bros. Kuhn Loeb* (9th Cir. 1985) 769 F.2d 561, the federal court of appeals found that the stockbroker's agency was relatively narrow. The plaintiff customer in *Caravan* had a nondiscretionary account with the defendant stockbroker. On the stockbroker's recommendation, the customer invested funds in securities which subsequently declined in value; the customer then sued to recover its losses, claiming that the stockbroker violated a fiduciary duty by not advising the customer of adverse information about the security after it had been purchased. The federal appeals court held that, under the circumstances presented, where there was a nondiscretionary account with no showing that the defendant stockbroker had any control over the account whatsoever or acted as an investment counselor to the plaintiff, the stockbroker was only a limited agent of the customer. "Normally the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete. [Citation.] The stockbroker [in such a situation] assumes no continuing obligation to

advise his [or her] clients of information that affects their securities. [Citation.]" (*Id.,* at p. 567.)[10]

Appellants' proposed jury instruction No. 39(a) was not wholly rejected by the trial court, which in fact gave a slightly revised version of the last sentence as part of its instructions on fiduciary duty. The rest of the instruction is either argumentative, misleading, incorrect, or covered by other instructions given by the trial court, which correctly reflected the actual state of California law.[11]

---

[10] We recognize that the opinion of the federal court of appeals in *Leboce* contains broad language which could be interpreted as supporting appellants' position herein that a broker owes no fiduciary duty to an investor of "sophistication and independence." (*Leboce, S.A.* v. *Merrill Lynch, Pierce, Fenner, etc., supra,* 709 F.2d at p. 607.) This flies in the face of repeated statements throughout *Twomey* and subsequent cases reaffirming the fiduciary nature of the relationship between a stockbroker and his or her customer. (*Twomey, supra,* 262 Cal.App.2d at p. 709; 2 Witkin, Summary of Cal. Law, Agency and Employment, *supra,* at § 287, pp. 284-285.) The correct reading of the opinion in *Twomey* is that there is in all cases a fiduciary duty owed by a stockbroker to his or her customers; the *scope* of this duty depends on the specific facts and circumstances presented in a given case. These include the relative sophistication and experience of the customer; the customer's ability to evaluate the broker's recommendations and exercise an independent judgment thereon; the nature of the account, whether discretionary or nondiscretionary; and the actual financial situation and needs of the customer. To the extent there is language in *Leboce, Caravan,* or any other federal case purporting to interpret California law as not imposing *any* fiduciary duty on a stockbroker unless he or she exercises *continuing control* over the customer's account or acts as an "investment counselor," we are in disagreement with the federal courts of appeals. Federal decisions are, of course, not controlling on matters of state law. (*Bank of Italy etc. Assn.* v. *Bentley* (1933) 217 Cal. 644, 653 [20 P.2d 940]; *Estate of D'India* (1976) 63 Cal.App.3d 942, 948 [134 Cal.Rptr. 165]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 781, pp. 751-752.)

[11] The trial court's actual instructions on fiduciary duty and breach thereof, in their entirety, were as follows: "A fiduciary or a confidential relationship exists whenever under the circumstances trust and confidence reasonably may be and is reposed by one person in the integrity and fidelity of another.

". . . . . . . . . . . . . . . . . . .

"Breach of Fiduciary Duty. Introduction: In this case plaintiffs are seeking to establish liability among others on a theory of a breach of fiduciary duty, on which I will now instruct you.

"A fiduciary relationship is a relationship of trust and confidence in another. A person is a fiduciary when they voluntarily assume a relationship of personal confidence with another whereby another person reposes trust and confidence in the integrity and fidelity of that person.

"Every person or entity who voluntarily assumes a relationship of personal confidence with another is a fiduciary not only as to the person who reposes such confidence, but also as to all persons over whose affairs he [or she], by such confidence, obtains any control.

"A commission for lawful services rendered is not an advantage gained under this instruction or rule. And the fact, standing alone, that the defendant received a commission for a transaction is not in and of itself proof of churning.

"The relationship between broker and principal is fiduciary in nature and imposes on the broker the duty of acting in the highest good faith towards the principal.

"If the broker, for all practical purposes, controls the account, whether by use of his [or her] discretionary power or by making recommendations which are regularly followed, there is an obligation to determine the customer's financial situation and needs.

Thus, the trial court's instructions address the general nature of fiduciary duty; define the relationship between stockbroker and his or her principal, or customer, as fiduciary in nature; and set forth the stockbroker's "obligation to determine the customer's financial situation and needs" where the stockbroker, "for all practical purposes, controls the account, whether by use of his [or her] discretionary power or by making recommendations which are regularly followed . . . ." In each of these instructions, the trial court used language taken directly from or paraphrasing *Twomey, supra,* 262 Cal.App.2d at pages 708-709, 719. The trial court went on to instruct: "So long as the customer is of sufficient intelligence and understanding to make the ultimate investment decision and does so, the customer controls that trade for that account." This instruction is a slightly modified version of the last sentence of appellants' proposed jury instruction No. 39(a), and is a virtually verbatim restatement of the language in several of the federal cases cited and relied on by appellants. (*Follansbee* v. *Davis, Skaggs & Co., Inc.* (9th Cir. 1982) 681 F.2d 673, 676-677; *Carras* v. *Burns* (4th Cir. 1975) 516 F.2d 251, 258-259; *David K. Lindemuth Co.* v. *Shannon Financial Corp.* (N.D.Cal. 1987) 660 F.Supp. 261, 265.)[12]

We conclude that the trial court did not err in refusing to give appellants' proposed instructions as submitted. To the contrary, the trial court would have erred and misstated applicable California law if it had given the proposed instructions. The instructions actually given by the trial court were comprehensive and correct.

### V

Much the same analysis applies to appellants' next contention, which is that the trial court erred in refusing to give two more of appellants' requested instructions, purportedly dealing with the standard for determining whether a stockbroker has breached his or her fiduciary duty.[13] As in the

---

"So long as the customer is of sufficient intelligence and understanding to make the ultimate investment decision and does so, the customer controls that trade for that account. When a person invests in securities he [or she] assumes the risks inherent in the market and must bear the losses therefrom.

"A stockbroker is not a guarantee [*sic*] of market performance. . . ."

[12] The trial court went on to give, in full, appellants' proposed jury instruction No. 27, stating that a person investing in securities "assumes the risks inherent in the market and must bear the losses therefrom," and that a stockbroker is not a guarantor of market performance. This instruction was based on language from *Stevens* v. *Abbott, Proctor & Paine* (E.D.Va. 1968) 288 F.Supp. 836, 850.

[13] The two instructions at issue are as follows: "[*Appellants'*] *Proposed Jury Instruction No. 29(a)* [¶] In approving a customer's account for options trading a broker is to use due diligence to learn the essential facts as to the customer, his [or her] investment objectives and financial situation, and shall make a record of such information. A broker is entitled to rely

case of the other two jury instructions already discussed, these proposed instructions are argumentative, confusing, misleading, and incorrect statements of the law. Moreover, the jury instructions which the trial court did give sufficiently covered the issue of breach of fiduciary duty.

■ A stockbroker's fiduciary duty requires more than merely carrying out the stated objectives of the customer; at least where there is evidence, as there certainly was here, that the stockbroker's recommendations were invariably followed, the stockbroker must "determine the customer's *actual* financial situation and needs. [Citations.]" (*Twomey, supra,* 262 Cal.App.2d at p. 719, italics added.) If it would be improper and unsuitable to carry out the speculative objectives expressed by the customer, there is a further obligation on the part of the stockbroker "to make this known to [the customer], and [to] refrain from acting except upon [the customer's] express orders. [Citations.]" (*Ibid.*) Under such circumstances, although the stockbroker can advise the customer about the speculative options available, he or she should not *solicit* the customer's purchase of any such speculative securities that would be beyond the customer's "risk threshold." (*Id.,* at p. 721.) The trial court's instruction on the broker's obligation to determine the customer's financial situation and needs was almost a verbatim quotation from *Twomey*.

Contrary to this correct statement of California law, appellants' proposed instructions would absolve the stockbroker from any responsibility to ascertain the customer's actual financial situation prior to recommending to the customer any security transaction, no matter how risky or speculative. This is simply incorrect; it is totally unsupported by any case law, and not in accordance with the applicable rules of the national stock and options exchanges. Under the facts of this case, appellants were on notice that Duffy wanted to speculate with the trust funds of an employee retirement and profit-sharing plan. Under these circumstances, appellants had an *obligation* to investigate the nature and amount of the funds Duffy sought to invest in options before soliciting or recommending any speculative transactions, and to refrain completely from soliciting such transactions if it became apparent

on the information provided by the customer and not required to make an independent investigation of the customer or of the customer's financial situation. [Citations.]"

"[*Appellants'*] *Proposed Jury Instruction No. 30* [¶] In recommending to a customer the purchase of an option, a broker shall have reasonable grounds for believing that the customer has such knowledge and experience in financial matters that he [or she] may reasonably be expected to be capable of evaluating the risks of the recommended transaction, and is financially able to bear the risks of the recommendation. In fulfilling this duty, a stock broker [*sic*] is under no duty to make an independent investigation of the customer's finances. Rather, a broker is permitted to rely on the facts, if any, disclosed to him [or her] by the customer. There is no affirmative duty on a broker to investigate or to solicit any facts before recommending to a customer the purchase, sale, or exchange of any security. [Citations.]"

that they would be inappropriate. Appellants' proposed instructions would improperly relieve the stockbroker of that legal obligation. We decline to approve of such a change in the law.

The instruction given by the trial court was a correct statement of the law. There was no error in refusing to give appellants' proposed instructions.

## VI

Appellants urge that the trial court erred in denying their posttrial motions for judgment notwithstanding the verdict and for a new trial. They contend that there was insufficient evidence to support the jury's verdict that appellants breached their fiduciary duty. The contention is without merit.

■ Our consideration of whether the judgment is supported by substantial evidence is governed by well-established rules. We must consider all the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97; 9 Witkin, Cal. Procedure, Appeal, *supra,* § 278, p. 289.) It is not our task to weigh conflicts and disputes in the evidence; that is the province of the fact finder—either the jury or the trial court. Our authority begins and ends with a determination of whether there is *any* substantial evidence, contradicted or uncontradicted, which will support the judgment. We must accept as true all evidence and all reasonable inferences from that evidence tending to establish the correctness of the jury's verdict and the trial court's findings, resolving every conflict in favor of the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Estate of Teel* (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384]; *Henry* v. *Sharma* (1984) 154 Cal.App.3d 665, 670 [201 Cal.Rptr. 478]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; *McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].) ■ Applying these rules, we conclude on the basis of our review of the entire record that the evidence supporting the verdict is substantial, that is, of "ponderable legal significance," "reasonable in nature, credible, and of solid value . . . ." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

Thus, the evidence shows that the account which respondents opened at Lehman Brothers was not the kind of account on which speculative investments might ordinarily be made, such as that of an individual of substantial means with sufficient assets reasonably to protect against risk. To the

contrary, it was a profit-sharing trust fund, representing the retirement contributions of the employees of respondents' company. Cavalier sought and obtained discretionary authority to manage this account, which Lehman Brothers approved for transactions in highly speculative options. When this discretionary authority was later rescinded, Cavalier continued to solicit speculative transactions on the account, recommending large purchases of options. Cavalier specifically solicited respondents' purchase of 100 highly speculative options costing $60,000, in spite of the fact that virtually the entirety of respondents' account was already invested in that particular stock option. Although Cavalier probably discussed each transaction with Duffy before it was entered into, Duffy invariably followed Cavalier's recommendations. Despite Duffy's own professed understanding of options and knowledge gleaned from previous experience in the stock market, both his own trial testimony and that of a stockbroker who worked for Duffy at a different stockbrokerage firm provide strong evidence to the contrary. The portrait of Duffy that clearly emerges from the testimony is of an unsophisticated and naive investor, extremely trusting of and reliant on the brokers with whom he worked, who actually had very little real understanding of the nature and risks of options.

We conclude that this evidence overwhelmingly supports the jury's verdict that appellants breached their fiduciary duty to respondents. Even if Cavalier did not transact many discretionary trades on respondents' account, the facts that Duffy relied on Cavalier's judgment, invariably followed Cavalier's recommendations, and manifested an inability fully to understand the risks of options trading, suggests that Cavalier actually "controlled" the account. (*Twomey, supra,* 262 Cal.App.2d at pp. 719, 722; *Follansbee* v. *Davis, Skaggs & Co., Inc., supra,* 681 F.2d at pp. 676-677.) Appellants were on notice that the account on which Duffy wanted to speculate belonged to a trust fund. Appellants had an obligation to determine respondents' *actual* financial situation and needs, and to refrain scrupulously from soliciting or recommending *any* inappropriate transactions on the account. It should have been clear to appellants from the nature of respondents' account and the kinds of speculative transactions Duffy wanted to make, that they had a fiduciary duty to warn respondents that such transactions were inappropriate and unsuitable for the account, and to refrain from acting on the account except upon respondents' *express, unsolicited orders.* (*Twomey, supra,* 262 Cal. App.2d at pp. 718-722.) The record shows that appellants breached this fiduciary duty.

VII, VIII*

. . . . . . . . . . . . . . . . . . . . . .

IX

The judgment is affirmed.

White, P. J., and Strankman, J., concurred.

A petition for a rehearing was denied December 27, 1989, and appellants' petition for review by the Supreme Court was denied February 15, 1990.

---

* See footnote, *ante,* page 1517.