**PETRO–DIAMOND INCORPORATED,**
**Plaintiff,**

v.

**SCB & ASSOCIATES, LLC,**
**et al., Defendants.**

Case No.: SACV 12–01893–CJC(ANx)

United States District Court,
C.D. California, Southern Division.

Signed August 21, 2015

952

Robert Roy Begland, Ryan John Alshak, Viral Mehta, Manatt Phelps and Phillips LLP, Los Angeles, CA, for Plaintiff.

Kent J. Schmidt, Bryan Martin McGarry, Dorsey and Whitney LLP, Costa Mesa, CA, J. David Jackson, Dorsey and Whitney LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM OF DECISION

CORMAC J. CARNEY, District Judge

### I

In an effort to reduce carbon monoxide and greenhouse gas emissions, as well as the nation's reliance on foreign petroleum-based fuels, Congress enacted legislation in 2005 mandating the increased use of renewable fuels in the transportation sector. Rather than requiring obligated parties to directly generate their requisite quota of renewable fuel, Congress further devised a credit program whereby parties could buy, sell, and trade "credits" representing a specified batch of renewable fuel on a secondary market. The idea behind the program was to provide flexibility to obligated parties and to allow the Environmental Protection Agency ("EPA"), which was tasked with promulgating the implementing rules and regulations, to easily track the country's collective volume of renewable fuel. Despite Congress's good intentions, the resulting credit-based renewable fuels market proved to be volatile and highly speculative. It is against this backdrop that the present case arose. Petro–Diamond Incorporated ("Petro–Diamond") brings this action against its former commodities broker, SCB & Associates, LLC ("SCB"), after SCB brokered several of Petro–Diamond's trade transactions in the renewable fuels market in 2010. It was later revealed that the credits that were the subject of those transactions were fraudulent, forcing Petro–Diamond to incur nearly $10 million in losses.

Petro–Diamond contends that SCB is liable for these losses and brought causes of action for breach of fiduciary duty, constructive fraud, and fraudulent concealment.

Between April 21 and May 5, 2015, the Court conducted an eight-day bench trial that involved several hundred exhibits and nine witnesses. The Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) by this Memorandum of Decision. After carefully reviewing all the evidence, testimony, and arguments presented by the parties' counsel, the Court concludes that Petro–Diamond has not proven by a preponderance of the evidence that SCB's conduct amounted to a breach of fiduciary duty, constructive fraud, or fraudulent concealment. SCB did not make any materially false or untrue statements to Petro–Diamond, nor did it omit any material facts necessary to make its statements not misleading. It was Petro–Diamond's—not SCB's—failure to conduct due diligence before executing the highly speculative and risky trade transactions that ultimately led to Petro–Diamond's losses.

### II

#### A

The Renewable Fuel Standard ("RFS") Program requires gasoline and diesel fuel producers and importers to ensure that transportation fuel in the United States contains a certain volume of renewable fuel. 42 U.S.C. § 7545($o$)(2); 40 C.F.R. § 80.1406. Under the RFS Program, renewable fuel—or fuel produced from renewable biomass such as planted crops, planted trees, or algae—is used to replace or supplement a portion of the fossil fuel traditionally present in transportation fuel through a process called blending. 42 U.S.C. § 7545($o$)(1); *Regulation of Fuels and Fuel Additives: Renewable Fuel*

*Standard Program,* 72 Fed.Reg. 23900–01 (May 1, 2007) ("RFS 2007"); *Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program,* 75 Fed.Reg. 14670–01 (Mar. 26, 2010) ("RFS 2010").[1] Obligated parties must each account for a particular volume of renewable fuel in gasoline each year. RFS 2007. Compliance is demonstrated through the acquisition of unique, 38–character Renewable Identification Numbers ("RINs"), which are assigned to every batch of renewable fuel that is produced or imported into the United States. *Id.* Each RIN represents a gallon of renewable fuel.[2] *Id.* To assist obligated parties in meeting their renewable fuel requirements, the RFS Program contemplates a credit system, which allows parties that produce or import renewable fuel in excess of their requisite volume to sell or transfer the corresponding RINs to others. 42 U.S.C. § 7545(*o* )(5). Importantly, the traded RINs are not physically attached to the actual fuel itself; rather, RINs act as credits that represent the underlying renewable fuel and can be freely bought and sold like commodities. RFS 2007. At the end of year, obligated parties meet their renewable volume obligation by submitting the RINs they either bought or produced to the EPA as proof of compliance with the mandate. *Id.*

The early, over-the-counter ("OTC") RIN market had little to no oversight by the EPA. In 2010, the EPA rolled out the EPA Moderated Transaction System ("EMTS"), an in-house clearing system, but this screening system only required parties to provide basic, unverified information about their RINs and lacked any "good faith" provision to RIN ownership. 40 C.F.R. § 80.1452; RFS 2010. As the OTC RIN market developed, parties within the industry realized that there were profit-making opportunities to be had. Petro–Diamond, a trader and distributor of light oil products, became active in trading RINs on the unregulated OTC market. (Durels, April 21 AM, 20:5–13; Hausig, April 29 PM, 158:6–23; Pascu, April 24 AM, 31:15–32:6.)[3] This case concerns six RIN transactions executed by Chelsea Pascu, a longtime employee of Petro–Diamond. (Pascu, April 24 PM, 29:4–5 [testifying that she began her employment at Petro–Diamond in 1995].) At the time the transactions at issue occurred in 2010, Pascu had $10 million of discretionary trading authority through which she could enter into deals for up to $10 million on each side of a transaction. (Hausig, April 30 AM, 83:25–84:5.) Rather than trading in direct sales or purchases of RINs, Pascu entered into what are referred to as "back-to-back" or "sleeve" transactions on all six trades, with Petro–Diamond acting as the sleeve. (Pascu, April 24 PM, 40:8–12; Pascu, April 28 AM, 41:6–22.)

In a sleeve transaction, a buyer and a seller of RINs act through an intermediary, or "sleeve." The seller sells his RINs to the sleeve who, at the time of purchase, simultaneously turns around and arranges the sale for that same number of RINs to the buyer for a slightly higher price. (Pascu, April 28 AM, 41:15–22.) The sleeve's profit, or "spread," is the difference between the sleeve's purchase price

---

1. The EPA first promulgated implementing regulations in 2007, (RFS 2007), which were followed by a revised set of regulations in 2010, (RFS 2010), after Congress enacted further legislation modifying the RFS Program.

2. The digits in each RIN correspond to identifying data. Because of the length and variety of RINs, abbreviations are used to denote the fuel type and production year. The RINs at issue here are "B10" and "B11" RINs, which refer to biodiesel RINs produced in 2010 and 2011, respectively.

3. Citations to the trial transcript reference the last name of the witness, the date, AM or PM session, and page and line number.

and the sale price, which is usually no more than a few cents per RIN. (*Id.,* 51:12–17.) In exchange for the spread, however, the sleeve guarantees to the ultimate buyer that the RINs will be timely delivered and valid under EPA regulations. (*See* Exh. 5.) In other words, the sleeve acts as an insurance policy for the buyer to offset the high risks of trading on the unregulated, "buyer beware" OTC market by guaranteeing the seller's performance and product. *See* RFS 2010.

Additionally, of the six transactions at issue, all but one was for the sale of B11 RINs through forward contracts. In a sleeve forward contract, as opposed to a prompt contract, the sleeve presently contracts with the ultimate buyer for the sale of the RINs, but sets the delivery date of the RINs several months into the future. When, as here, the contracts are arranged in the present year (2010) for B11 RINs produced in the following year (2011), the sleeve essentially guarantees the validity and delivery of RINs that have not even been produced at the time the deal is arranged. (Exh. 5; Durels, April 21 PM, 66:25–68:9.)

The very risks that Petro–Diamond undertook in these sleeve forward contracts materialized. The seller in all six transactions was a company named Absolute Fuels, LLC ("Absolute"). In January 2011, the EPA audited Absolute and suspended Absolute's ability to transfer its RINs for approximately one month. (Durels, April 21 AM, 63:20–64:20.) Although Absolute was temporarily permitted to resume transferring RINs, the EPA launched a formal investigation into Absolute and ultimately issued a Notice of Violation the following year, invalidating all Absolute RINs dating back to August 2010. (Exh. 91.) Absolute's President, Jeff Gunselman, later pled guilty to criminal charges for wire fraud, money laundering, and violations of the Clean Air Act. (Exh. 92.)

As a result, Petro–Diamond was forced to either secure replacements for Absolute's RINs or enter into cash settlements with the ultimate buyers. (Hausig, April 29 PM, 192:24–193:9.) All of Petro–Diamond's transactions with Absolute were brokered by SCB. The novel question before this Court is whether SCB is liable for any of Petro–Diamond's resulting damages for its role in brokering the transactions with Absolute.

**B**

Beginning in 2009, Petro–Diamond's Pascu traded RINs through the use of multiple RIN brokers, including SCB. (Pascu, April 24 PM, 34:10–25.) SCB, a commodity brokerage firm in the renewable energy OTC market, presented its brokers as "leading experts in renewable markets" that "evaluate and integrate information from diverse sources in order to surface normally unrecognized relationships in the interplay between biofuels, traditional energy and agricultural markets." (Exh. 79–1, SCB Website.) In addition to brokering RINs, SCB also brokered physical feedstock necessary to produce biofuel, such as meal, corn oil, and soybean oil. (Durels, April 21 PM, 64:1–7, 23–25.)

Pascu dealt exclusively with Simon Silin of SCB. (Pascu, April 24 PM, 37:6–7.) Beginning in March 2010, the two communicated daily using an instant messaging system. (*See* Exh. 14.) For the most part, Silin's instant messages consisted of a stream of information on that day's RINs bids, such as price, quantity, and transfer date. For example, a typical message would read, "E09's @ 160 last E10's 250 bid last B09's @650 last B10's 2450 bid last ... E10 @325 ... E10 @320 ... E10 250@320 ... E09 125 bid ... B10 24 bid ..." (*See id.*) If Pascu wanted to enter into any of the trades Silin presented, she

would respond by indicating her interest, and Silin would set up the proposed transaction by sending a written broker confirmation to the parties. (*See* Exhs. 2–3.) Early on, Pascu indicated an interest and preference for sleeve transactions, with Petro–Diamond acting as the sleeve. (Pascu, April 28 AM, 79:15–24; Silin, April 23 AM, 5:21–6:6.)

In November 2010, Silin began presenting Pascu with opportunities to enter into sleeve transactions involving Absolute, a Texas biofuel producer. (Exhs. 273, 275.) The first transaction was arranged on November 8, 2010. Silin contacted Pascu and asked if she was interested in sleeving a transaction for 1 million B11s for a $.02/RIN spread with Absolute as the seller and ED & F Man as the buyer. (Exh. 275.) Pascu immediately agreed. (*Id.*) Later that day, Silin called Pascu back to verbally confirm the exact details of the transaction, (Exh. 276), and followed up with a written broker confirmation, (Exh. 2–2–2–3). Thereafter, Petro–Diamond and ED & F Man contracted directly with one another and executed a formal written contract, (Exh. 5–11–5–18 ["ED & F Contract"]). Under the contract, Petro–Diamond warranted that the RINs "were properly generated or are otherwise valid pursuant to RFS Regulations...." (ED & F Contract.)

The second and third transactions were arranged in a similar fashion. On November 19, Silin called Pascu with a proposed sleeve transaction between Absolute and Morgan Stanley for 500,000 B10s for a $0.005/RIN spread. (Exh. 287.) Pascu immediately responded, "Sure, that works for me," (*id.*), and Petro–Diamond and Morgan Stanley directly contracted with each other for the sale, (Exh. 5–19). That same day, Silin sent Pascu an instant message asking, "you ok buying B11s from absolute if I can get more done today?" to which Pascu responded, "sure." (Exh. 14–234.) Silin later called Pascu, proposing a sleeve transaction between Absolute and Lansing for 1 million B11s for a $0.04/RIN spread. (Exh. 289.) During this phone call, Pascu asked her first two questions about Absolute. The first question was "Now, what's your feeling on Absolute. I mean now that we've got this Verdeo, I'm a little gun shy."[4] (*Id.*) Silin responded,

> You know, so far I've probably done business with them for about, I want to say maybe like a month or so ... But before I got to 'em, there's been one broker who seemed to have been in touch with them, and he set 'em up with most of the majors. So I've done business with Absolute. He has sold to Citgo, Tesoro, Sunoco, and Marathon ... and all of them have bought from him, uh, more than one, and they have done ... prompt transfer ... I mean, you know, he's delivered on every—on everything that was prompt.... [H]e just said he's interested in selling 11 because, according to him, he's locked in contracts, I guess, for the next year. So he ... said that he's guaranteed, um, to get these RINs; it's gonna be I think like four or five million a month that he can do.

Pascu's second question was "[A]re they a producer or what exactly are they?" Silin responded,

> He's a producer ... in Texas. He, uh, claims that he's 72, uh, million gallons per year.... I kind of maybe thought the same thing, but then he bid us for ... physical product as well. So, you know, I—I wouldn't think that if there was something going on there, he wouldn't be—he wouldn't be bidding us for—for physical.

---

4. Earlier that day, Pascu had mentioned to Silin that she was having performance issues with a company called Verdeo. (Exh. 14–234.)

(*Id.*) In response, Pascu commented that Verdeo had also asked for physical product but went on to confirm she was "good for that deal" as the sleeve between Absolute and Lansing. (*Id.*) Pascu made further comments about her performance problems with Verdeo and asked Silin to relay any information he came across about Verdeo. (*Id.*) Silin agreed. (*Id.*) Petro–Diamond then entered into its third transaction with Absolute and executed a formal contract directly with Lansing for the sale of 1 million B11s. (Exh. 5–35–5–37.) The contract included a provision cancelling and superseding the broker confirmation, and Petro–Diamond made the same warranties regarding the validity of the RINs as its other contracts. (*Id.*)

Petro–Diamond did not enter into its next and fourth transaction with Absolute until a month later on December 17. Between Petro–Diamond's third and fourth transactions, the managing director of SCB, Mike Durels, visited Absolute's plant in Littlefield, Texas on December 3. (Exh. 76.) In Durels's notes recalling his visit one year after the fact, he explained that he met with Gunselman for approximately two hours in his office and that the two then drove over to the closer of Absolute's two plants. (*Id.*) During the drive, Gunselman explained to Durels that the plant was not currently producing because Absolute was in the middle of expanding to double its production capacity. (*Id.*) When they arrived at the site, Durels observed a plant with two large PVC type tanks with lines attached and a small control room. (*Id.*) There was one employee at the site, which Durels attributed to the fact that it was late Friday evening and the plant was under renovation. (*Id.*)

That following Monday, Pat Fitzgibbon of Trafigura, who knew of Durels's visit to Absolute, called to inquire about what Durels had seen. (Exh. 426.) Durels confirmed that he spent several hours with Gunselman and saw the Littlefield plant, which Gunselman had purchased the year before. In response to Fitzgibbon's question "And he says that plant's running?" Durels explained that Absolute had poured "a new foundation" to expand the facility and so everything, including the four large tanks for batch processing, was shut down. (*Id.*) After Fitzgibbon commented that he knew Gunselman "absolutely has the one plant," alluding to Gunselman's purchase of a preexisting plant, Durels further disclosed the following facts:

And he's putting some money into it . . . it's not like, you know, this was a delinquent facility. Even though it wasn't operating when I was there, you could see that, uh, the loading facility for the trucks—that was all new. Um, he had big centrifuge pumps sitting there that he was waiting, again, for the concrete to cure to set these things up. And they were like brand new pumps. There were several large tanks out in the yard. Um, I'm not even sure what those were for, some kind of holding tanks. . . . I can just say it looked like it was an ongoing [indiscernible].

(*Id.*) After hearing these additional details, Fitzgibbon indicated that he felt "much better" about Absolute. Durels agreed and added that Gunselman had shown him a sample of his biodiesel. He concluded, "All I can say is that what I saw, it looked like a legitimate business and from what he was telling me in terms of the business he's doing and the kind of business and how that business is driven, it made sense." (*Id.*)

That same Monday, Pascu asked Silin over instant message "How was [A]bsolute?" (Exh. 14–245.) Silin responded,

[W]ill give you overall when I speak to you on the phone but short version is from what we saw there is nothing indicating what he is doing is illegal . . . he is a very young entrepreneur who is

basically running this thing on his own ... plant is there ... office is there ... but realistically he can walk away at any minute because he paid out of pocket for everything that exists so there is no debt to be chased ... will call you later to give you more detail on the Absolute guy—but looks good for now.

(Exh. 14–245–14–246.) [5]

Over a week after Durels's visit to Absolute and four days before Silin presented Pascu with what would be Petro–Diamond's fourth Absolute transaction, Silin made a call to Gunselman. (Exh. 296.) During the first half of the call, the two discussed Absolute's feedstock needs, including oil, grease, soybean, and cotton seed. They also discussed the ongoing progress of the plant expansion, and Gunselman noted that due to time lost with the expansion and the upcoming holidays, Absolute did not intend to generate or sell any more RINs for 2010. (Id.) At some point during the call, Gunselman point-blank asked Silin if he had heard any more "trash talk" about Absolute. (Id.) Silin said he had not and explained that when something had been asked, "we just told them exactly, uh, how we felt it was and, uh, and we've never had an issue since." (Id.) Silin testified that he understood Gunselman's comment about "trash talk" to refer to Fitzgibbon, who was the only person Silin was aware of with concerns about Absolute's production. (Silin, April 23 AM, 76:2–19.)

During that same call, Gunselman also informed Silin that another company, Houston Refining, had cancelled one of its trades with Absolute because it had become nervous from the "trash talk." (Exh. 296.) Silin testified that he understood Houston Refining's nervousness to again be a reference to Fitzgibbon. (Silin, April 23 AM, 77:4–9 ["But Pat and [Houston Refining's] Dustin spoke a lot. So it came from Pat Fitzgibbon."].) Gunselman further went on to say that this was the only problem he had encountered thus far and that others "like Sunoco and Citgo and BP, and all them, they didn't have any issues at all that they raised, and they paid promptly." (Id.) Silin responded;

[S]ometimes these guys like to limit their exposure to certain things and, uh, um, all of them have, uh—have been at this point more than satisfied because delivery has been prompt, it's been scheduled prior to, um, when it's due. And, uh, you know, as far as—as that part goes, there's just nothing that, uh—that they could ask for more.

(Id.) At trial, Silin testified that the "exposure" he was referring to was "credit [exposure], which could be delivery exposure." (Silin, April 23 AM, 79:13–15.)

On December 17, Silin called Pascu with another proposed transaction for Absolute B11s and asked if she was "still good" to work with Gunselman." (Exh. 297.) Pascu responded, "Yeah. I mean, why—unless you think otherwise." (Id.) Silin echoed his previous statement that Durels had visited Absolute and that Absolute's prompt contracts had been good. (Id.) Pascu indicated she had no problem working with Absolute, and Silin confirmed a sleeve transaction for 3 million RINs—1 million to Center, 2 million to Northville—for a $0.015/RIN spread. (Exh. 299.) This was Petro–Diamond's fourth transaction with Absolute. As before, Petro–Diamond executed its own contracts with Center and Northville superseding the broker confirmation note and guaranteeing the validity of the RINs. (Exh. 5–43–5–60.)

---

**5.** The parties did not present a recording or transcript of any follow-up phone call. At trial, Pascu testified that she recalled a follow-up call that left her "with confidence" SCB had seen a producing plant, but she could not remember any specifics of the supposed call. (Pascu, April 28 PM, 61:9–62:2.)

The fifth transaction took place on December 20. Silin called Pascu with another potential Absolute sleeve transaction for 2 million RINs involving three different buyers. (Exh. 300.) Pascu asked if Silin was "comfortable with the amount he's selling." (*Id.*) Silin answered "[Gunselman]'s saying that he has, uh, his contracts locked in for Q1, and we're actually working on ... feed stock right now, and he's buying ... a lot of it." (*Id.*) Silin went on to say that Gunselman had been performing well on prompt contracts (doing 6–7 million RINs per month) and that all of SCB's majors "are fine dealing with him" and had received everything on time. (*Id.*) Pascu replied, "I'm good with that then," and immediately changed the subject to B10s with another party. (*Id.*) Petro–Diamond went on to execute three different contracts with Vinmar, Marathon, and Glencore for 3 million Absolute RINs for a $.03–$.04/RIN spread. (Exh. 14–272; Exh. 5–66–5–95.)

The sixth and final transaction took place on December 29 when Silin called Pascu with a proposed sleeve transaction for 2 million RINs between Absolute and Chevron for a $0.03/RIN spread. (Exh. 308.) Pascu agreed to the deal and then asked, "Now, in your opinion, we're not getting too heavy with Absolute?"[6] (*Id.*) Silin responded that SCB had "just ... today locked in" physical feedstock deals with Absolute. Silin noted that Absolute "bought a lot ... a whole lot. So, I mean, you know, he's—he's definitely producing." (*Id.*) Silin further commented that since it was the end of 2010, the B11s were "pretty much done." (*Id.*) He explained that

clients were fine dealing with Absolute on a prompt basis for B10s, which "they know that he has." (*Id.*) Pascu responded agreeably, and Petro–Diamond executed the final Absolute contract for 2 million RINs with Chevron. (Exh. 5–105–5–107.) Collectively, in less than two months, Pascu sleeved 9,378,500 RINs across six transactions involving nine different buyers and Absolute as the seller. Pascu's gross profit from these transactions totaled $263,900.00, minus the commission she promised to Silin.

### III

Petro–Diamond asserted claims for breach of fiduciary duty, constructive fraud, and fraudulent concealment against SCB. Petro–Diamond's evidence, however, is insufficient to establish liability on SCB's part for any of these claims.

### A

■ To prevail on a breach of fiduciary duty claim under California law, Petro–Diamond must prove: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damage caused by the breach. *Pellegrini v. Weiss*, 165 Cal.App.4th 515, 524, 81 Cal.Rptr.3d 387 (2008). The absence of any one of these elements is fatal to a plaintiff's cause of action. *Pierce v. Lyman*, 1 Cal.App.4th 1093, 1101, 3 Cal. Rptr.2d 236 (1991). As an initial matter, the Court notes that Petro–Diamond only claims damages from transactions 4, 5, and 6, which occurred between December 17 and December 29. (Dkt. No. 199 ["Pl.'s Post–Trial Br."]; Dkt. No. 202 ["Pl.'s Post–Trial Reply"] at 5.)[7] In any event, as

---

**6.** A few days earlier, Pascu had mentioned that she didn't "want to get too long with one company," in light of her ongoing performance problems with Verdeo, but that she was "still interested in getting in between just need to proceed a bit more cautiously." (Exh. 14–278.) Silin responded, "will let you know if I hear about [Verdeo] or anyone else

in the future, make an effort to ever keep it from happening again." (*Id.*)

**7.** Petro–Diamond initially claimed damages arising from transaction 2, but later acknowledged that Silin's statements preceding that transaction were true at the time he made them. (Pl.'s Post–Trial Reply at 5.)

the entire course of Pascu's dealings with Silin is relevant to determining the scope and purported breach of fiduciary duty, the Court examines all interactions and conversations between the two.

■ California imposes a fiduciary duty on every broker-customer relationship. *Duffy v. Cavalier*, 215 Cal.App.3d 1517, 1535, 264 Cal.Rptr. 740 (1989). The critical inquiry, however, is what the *scope or extent* of that duty is. The scope of a fiduciary duty "varies with the facts of the relationship." *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 425, 58 Cal. Rptr.2d 875, 926 P.2d 1061 (1996) (citing *Duffy*, 215 Cal.App.3d at 1535, 264 Cal. Rptr. 740). The facts and circumstances that determine the scope include (1) the relative sophistication and experience of the customer; (2) the customer's ability to evaluate the broker's recommendations and exercise an independent judgment thereon; (3) the nature of the account, whether discretionary or nondiscretionary; and (4) the actual financial situation and needs of the customer. *Duffy*, 215 Cal. App.3d at 1536 n.10, 264 Cal.Rptr. 740.

■ All four *Duffy* factors support a finding of a very limited fiduciary duty in this case. First, Petro–Diamond is, without question, a sophisticated party in the energy and petroleum market. Petro–Diamond has been a fuel distributor for decades, and Pascu had been employed by Petro–Diamond for 15 years at the time she entered into the transactions at issue. During the relevant time period, Pascu was Petro–Diamond's marketing manager and ethanol and fuel credits trader and had three employees reporting directly to her. (Hausig, April 29 PM, 167:22–24; 168:22–169:22.) Pascu testified that she attended several industry conferences on a fairly regular basis, read a daily "West Facts" publication on gas and diesel markets, and had a "pretty clear understanding" of the dense, constantly-changing EPA regulations as it relates to RIN trading. (Pascu, April 28 AM, 28:5–13; 29:22–31:22.) Pascu's $10 million discretionary trading authority, which she exercised in the OTC RIN market at its inception, is further evidence of Pascu's experience and seniority. (*Id.*, 171:23–170:1–7.) Pascu's authority to enter Petro–Diamond into any given trade was practically unlimited; indeed, Petro–Diamond's President and Chief Operating Officer, Andrew Hausig, first learned that Petro–Diamond was transacting with Absolute only after Pascu had already arranged the first several deals. (Hausig, April 29 AM, 167:14–168:21.)

By comparison, SCB is a broker trading RINs and feedstock. Its role is to relay transactional information and connect parties, or principals, together. Because of the ever-changing value of RINs throughout the day, part of SCB's brokering process is to constantly update clients with pricing information by sending bids and offers through telephone communication and instant messaging. (Durels, April 21 PM, 61:15–62:11.) After connecting the principals, however, the broker has no involvement in the execution of the RIN transaction. (*Id.*, 73:14–19.) Unlike parties who directly purchase and sell RINs, brokers need not register with the EPA and, for that matter, lack access to the EMTS. (*Id.* 74:8–16.) The disparities in the roles of Petro–Diamond and SCB are apparent in the written broker confirmations and final contracts. The written broker confirmations were limited to detailing the type, quantity, price, and delivery date of the RINs. None of the involved parties signed the broker confirmation; to the contrary, the confirmation encouraged the parties to promptly exchange their own documentation. Petro–Diamond's formal contracts, on the other hand, covered all the same basic terms as the broker confirmation and additionally included provisions

regarding payment terms, governing law, warranties, assignments, default, and indemnities. The formal contract, not the broker confirmation, ultimately governed the transaction.

The second and third factors also weigh in favor of a narrow duty. Petro–Diamond had the ability to evaluate any proposed transaction from SCB and exercise its own independent judgment. Pascu testified that there were a number of due diligence measures that Petro–Diamond had at its disposal, including the ability to obtain a party's W–9, run a Dun & Bradstreet report [8], verify whether a party is registered on the EMTS or EPA website, run a small volume test trade, and even simply conduct internet searches of the party's website and the facility's location to verify its existence. (Pascu, April 28 AM, 91:8–93:4; Heaton, April 29 AM, 77:16–78:9.) There is also nothing to indicate that Pascu could not have gathered more information by simply asking for more specific details from Silin or even Durels, as Fitzgibbon did when he called to inquire about Durels's visit to the Absolute plant. Indeed, given the significant risks undertaken by a sleeve, it is only prudent that a party would perform its own due diligence.

It is undisputed that Petro–Diamond could exercise its own judgment and that SCB had no discretion over whether Petro–Diamond entered into any given trade. Every single transaction that Silin brokered for Pascu began with Silin asking Pascu if she was interested in a particular transaction. In other words, SCB could not, at any point, act unilaterally to enter a transaction on Petro–Diamond's behalf; rather, SCB only presented opportunities to Petro–Diamond, who would then either agree or reject the proposed deal. (See, e.g., Exh. 14–211 [After Silin asks "hey im

275@275 on E10s, any interest either way?" Pascu responds, "no thanks they should go higher with [the market] behaving the way it is."].) After SCB distributed a broker confirmation, Petro–Diamond executed its own contracts directly with the buyer and seller, superseding the broker confirmation.

Fourth and finally, this is not a case where the financial needs of the customer justify imposing a higher fiduciary duty on the broker. Petro–Diamond is a commercially sophisticated trader that, based on its own risk analysis, made a calculated, strategic decision to pursue sleeve transactions. (See Pascu, April 28 AM, 35:9–36:5.) As such, "[c]ases involving brokers who had practical control over the accounts of naïve investors ... are not controlling here." *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.2d 605, 607 (9th Cir.1983); *Compare id.* (finding that "no extensive fiduciary relationship existed" between a broker and its highly sophisticated and independent investment holding company-customer), *with Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 712–14, 69 Cal. Rptr. 222 (1968) (finding that a stockbroker owed a fiduciary duty to a widow-customer with no securities or stocks experience and who, at the broker's advice, sold her entire portfolio at a loss to turn the proceeds over to the broker to independently invest).

Petro–Diamond argues that additional considerations beyond the *Duffy* factors weigh in favor of a heightened duty. Specifically, Petro Diamond points out that SCB marketed itself as a "leading expert" in the renewable fuels market and that Silin took on a much higher commission than other brokers. Neither of these facts

---

**8.** A Dun & Bradstreet report contains various information about any given company, including financial information, business registration and ownership, and public filings such as bankruptcies, judgments, and liens. (Heaton, April 29 AM, 80:1–8; 83:2–9.)

is compelling. This language on SCB's website is mere promotional puffery and is not a specific statement of the services SCB offers as a broker. In any event, the language refers to SCB's ability to "surface normally unrecognized relationships," which, at best, means facilitating connections between parties within the industry—not evaluating risks inherent in RIN trades, as Petro–Diamond contends. As to Silin's higher commission, the evidence presented at trial showed that Pascu offered a larger amount of the spread to incentivize Silin to bring her more sleeve transactions, not as any sort of payment for extra verification services from a broker. (*See* Exh. 14–215 [after Pascu volunteers, "am willing to share more profit with you," Silin responds, "why I value you and bring it all to you first"]; Exh. 14–216 [after Silin accepts Pascu's higher commission offer on the first sleeve transaction with Absolute, Pascu states, "Thank you we need more of those."].)

The nature of Petro–Diamond and SCB's relationship therefore supports a narrow duty. Although no cases explicitly define the RIN broker-customer relationship in the emerging RIN OTC market context, the Court finds instructive several California cases declining to impose an affirmative disclosure requirement when the *Duffy* factors similarly weighed in favor of a limited duty. *See, e.g., Brown v. Cal. Pension Adm'rs & Consultants*, 45 Cal.App.4th 333, 348, 52 Cal.Rptr.2d 788 (1996) (finding "absolutely no responsibility to advise [customers] with regard to the wisdom of their investment choices" when the relationship was confined to respondents' performance of transactions selected by their customers); *Petersen v. Sec. Settlement Corp.*, 226 Cal.App.3d 1445, 1453–55, 277 Cal.Rptr. 468 (1991) (holding that a broker without direct access to customers and who did not provide recommendations that were "invariably followed" had no duty to warn about the risky na-

ture of investments). Like the clearing broker in *Petersen*, SCB's role was confined to little more than the simple performance of transactions ordered by the customer. *See Petersen*, 226 Cal.App.3d at 1456, 277 Cal.Rptr. 468. It is unreasonable to impose a broader duty on SCB, particularly in the context of brokering sleeve transactions in the early OTC RIN market. The EPA's cautionary description of the RIN market as "buyer beware" highlights that the risks of RIN invalidity, nonperformance, and faulty credit were on the buyer. As a sleeve, Petro–Diamond was aware of these risks (as indicated by its contract warranties) and, in fact, made a profit from guaranteeing to wary buyers that it would shift such risks onto itself. Imposing liability on SCB for failing to make an affirmative disclosure or conduct independent investigation would dramatically alter the multimillion dollar risk Petro–Diamond knowingly undertook and, in effect, unfairly transfer that risk onto SCB. That significant risk is one SCB did not assume.

SCB's fiduciary duty to Petro–Diamond was a limited one and only required SCB to make statements that were accurate and not misleading. *See* 5 Witkin, Summary Cal. Law (10th), Torts, § 799 ("Liability is also recognized where one who is under no duty to speak nevertheless does so."). Put another way, SCB would breach its duty if it made a materially false or untrue statement, or a statement that is misleading through the omission of a material fact. *See id.* §§ 773, 799. Whether a statement is false or misleading depends on context, as every statement must be viewed from the perspective of a reasonable, similarly-situated listener giving a fair interpretation of the statement and taking into consideration any surrounding representations, qualifiers, and facts. Since all of Petro–Diamond's claimed losses arise from the 2010 sleeve transactions

with Absolute, the only relevant communications between the parties are those preceding Petro–Diamond's agreement to enter into each of the transactions.[9] Here, Petro–Diamond has failed to meet its burden to prove that any of SCB's statements misrepresented facts or were misleading.

There is no evidence of any misrepresentations or omissions by Silin leading up to the third transaction on November 19. At that point, the only representation Silin made about Absolute was that it had "sold B11s in the past," which was consistent with what Gunselman had represented to him five days earlier and is confirmed by Gunselman's factual resume. (Exh. 273; Exh. 94 ["Factual Resume"] [listing Gunselman's RIN sales transactions from September 2010 through September 2011].) Prior to agreeing to the third transaction on November 19, Pascu asked her first question about Absolute: "[W]hat is your feeling on Absolute?" In response, Silin made three representations: (1) that Silin had "done business" with Absolute for about a month; (2) that another broker had set up Absolute with "most of the majors," such as Citgo, Tesoro, Sunoco, and Marathon, in prompt transfers and that Absolute had delivered everything on the prompt transactions; and (3) that "according to [Gunselman] he's locked in contracts" under which Gunselman guaranteed four to five million RINs per month for the next year. The evidence shows that each of these statements was accurate and not misleading. SCB had brokered a transaction with Absolute about two weeks earlier, (Exh. 64–

298–6303), and Pascu testified that the two-week difference was not material, (Pascu, April 28 AM, 129:4–15). Absolute had, at that time, transacted with all the majors Silin identified. (See Factual Resume.) With respect to the representation Silin made about what Gunselman told him about his contracts and prompt performance, Silin presented uncontroverted testimony that he learned these facts from Gunselman and other parties. (Silin, April 23 AM, 49:1–10.) There is no evidence to suggest that any of Silin's representations were otherwise false or misleading.

In response to Pascu's second question—"are they [Absolute] a producer or what exactly are they?"—Silin represented (1) that Absolute is a producer in Texas, and (2) that Gunselman "claims" he could produce 72 million gallons per year. Both of these statements are true. (See Exh. 273 [Gunselman tells Silin he produces 6–7 million RINs per month].) Silin further expressed his own skepticism as to Gunselman's claimed volume but ruminated that his concerns were lessened because Gunselman was bidding on physical product. To the extent this was even a representation of fact, Pascu demonstrated that this statement had little or no effect on her, as she quickly rebutted that physical product was *not* a dispositive indicator of reliability, as Verdeo had also asked for physical product. (Exh. 289.) There is no evidence before the Court to suggest that any of Silin's November 19 representations were false, and Pascu testified that she did not believe Silin had omitted information

**9.** At trial, Petro–Diamond presented evidence of SCB's representations made in early 2011—*after* Petro–Diamond had already entered into the transactions at issue in 2010. Accordingly, none of SCB's communications in 2011 could have been a factor in causing Petro–Diamond's harm. Nor does the Court find that SCB had an ongoing duty to provide Petro–Diamond information after the transactions were complete in 2010. *Cf. Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb*, 769 F.2d 561, 567 (9th Cir.1985) (explaining that once a transaction concerning a nondiscretionary account is complete, a stockbroker has no continuing obligation to advise clients of information affecting their securities).

about Absolute at that time. (Pascu, April 28 AM, 128:25–129:3.)

With respect to the fourth transaction, Petro–Diamond argues that Silin failed to inform Pascu of material information that he had learned in the interim of transactions 3 and 4: that (1) Durels did not see a producing plant during his visit to Absolute, and (2) Houston Refining had cancelled its contract with Absolute. As explained above, SCB did not owe Petro–Diamond an affirmative duty to disclose information to Petro–Diamond, so to the extent Petro–Diamond argues Silin failed to volunteer such information, this goes beyond the scope of SCB's duty.[10] Silin's omissions pertaining to the plant visit and Houston Refining's cancellation are relevant only to the extent that they rendered his other statements misleading.

■ After Durels's trip in early December 2010, Pascu posed the general question: "How was [A]bsolute?" The only competent evidence of the ensuing exchange is the December 6 instant message conversation in which Silin communicated that "from what we saw there is nothing indicating what he is doing is illegal ... Plant is there ... Office is there ... but realistically he can walk away at any minute because he paid out of pocket for everything that exists so there is no debt to be chased." Silin's statement does not misrepresent any of the facts—his state-ment was consistent with Durels's ultimate conclusion that everything looked "legitimate" and that the plant and the office were there. Silin further cautioned Pascu that the office and plant's existence were limited safeguards against Gunselman's ability to "walk away." The restraint with which Silin described the scene—only confirming that the plant and office were physically present—speaks volumes as to what Silin was *not* willing to say: that the plant was operating. And a reasonable commodities trader would not have understood his statement to mean a plant was operating. If Pascu had truly been looking to verify production, such a restrained response should have prompted her (or the reasonable trader) to follow up with something along the lines of "Is the plant running?" as Fitzgibbon did. Pascu, however, did not specifically ask any questions about the plant's production (or any questions at all, for that matter).

■ ■ Petro–Diamond also argues that Silin should have disclosed that Houston Refining cancelled its sale with Absolute and that there was "trash talk" about Absolute in the industry. Prior to agreeing to the fourth transaction, Pascu did present Silin with an opportunity to disclose additional information about Absolute. (Exh. 297 [in response to Silin "checking" if Pascu was "still good" to work with Absolute, Pascu

---

**10.** The facts surrounding Durels's plant visit, in particular, provide additional support as to why it would be unreasonable to broaden SCB's duty. SCB's primary service is to broker transactions, not provide expert opinions or reports regarding renewable fuel production. Durels, SCB's managing director, does not have any sort of engineering background. Even Durels's description of Absolute's biofuel sample is telling. (*See* Exh. 426 [describing the sample as "it looks like it, uh, was real dark ... it was reasonably clear but it was a real dark brown kinda stuff"].) Furthermore, Durels's candid statements to Fitzgibbon days after the plant visit demonstrate that Durels sincerely believed Absolute had another producing plant and that the Littlefield plant was undergoing renovations. Durels stated he had observed a new loading facility, new centrifuge pumps, concrete that had been recently poured, and several large tanks. (*Id.*) Durels's conclusion was that, after nearly five hours of face time with Gunselman, Absolute's business model "made sense" and everything he had seen appeared legitimate. (*Id.*) In light of this evidence, it is unclear which aspects of Durels's visit would have been material, even if SCB *had* a duty to affirmatively disclose material facts.

stated, "Yeah .... unless you think otherwise"].) Silin's answer in the negative was not rendered misleading by his failure to disclose Houston Refining's cancellation. For starters, his general response had nothing to do with any rumors, as he only again pointed to Durels's visit and that Absolute had been good on prompt contracts. More importantly, Silin testified that the only "trash talk" he was aware of came from Fitzgibbon, who he believed was responsible for causing Houston Refining's "nervousness" and subsequent cancellation with Absolute. (Silin, April 23 AM, 76:2–19; 77:4–9.) Silin further testified that Durels had already "had a conversation" with Fitzgibbon. (*Id.* 76:9–19.) This conversation did occur—during a 13—minute phone call on December 6, Fitzgibbon made an extensive inquiry about Durels's visit to Absolute. That conversation ended with Fitzgibbon expressing that he was relieved to hear the details of Durels's trip. Seeing as how Durels alleviated Fitzgibbon's many concerns (and with it, the underlying source of Houston Refining's nervousness), it is reasonable that Silin would not "disclose" what he considered an immaterial and now-resolved issue. Not every omission is material, and under these facts, the Court finds that Silin's omission regarding Houston Refining did not amount to a breach of fiduciary duty. *Cf. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (explaining that "[s]ome information ... of such dubious significance" need not be disclosed, as providing immaterial information is "hardly conducive to informed decisionmaking"); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* —— U.S. ——, 135 S.Ct. 1318, 1329, 191 L.Ed.2d 253 (2015) (explaining that, with respect to opinion statements in the securities context, an issuer's failure to disclose facts "cutting the other way" is not necessarily actionable because "a reasonable investor does not expect that *every* fact known to an issuer" will be disclosed (emphasis added)).

█ Finally, Petro–Diamond points to two statements Silin made regarding Absolute's purchase of physical feedstock and "production" prior to the fifth and sixth transactions. First, Petro–Diamond contends that Silin's December 20 statement to Pascu that Absolute was "buying a lot of [feedstock]" was untrue because SCB's business records show that Absolute had not purchased any feedstock as of that date. However, this misunderstands the full context of Silin's statement, which was that *"we're actually working on feed stock right now* and he's buying a lot of it." (Exh. 300 [emphasis added].) The reasonable listener would have understood Silin's statement, not in a vacuum, but within the broader context to mean SCB was in the process of brokering a feedstock deal for Absolute. *See Omnicare*, 135 S.Ct. at 1330 ("So an omission that renders misleading a statement ... when viewed in a vacuum may not do so once that statement is considered, as appropriate, in a broader frame."). And it was certainly true that SCB was "working on" feedstock deals for Absolute, as evidenced by the fact that three days later, SCB brokered the sale of 450 metric tons, or five railcars, of canola seed for Absolute. (Exh. 3–1–3–3.) One week after that, SCB brokered a second sale for Absolute for 219,996 bushels of soybeans. (Exh. 3–4–3–6.)

█ Second, Silin's December 29 statement that Gunselman had bought "a whole lot" of feedstock and "so, I mean, you know, he's ... he's definitely producing" must similarly be taken in the statement's entire context. (Exh. 308.) Petro–Diamond takes issue with the qualifier "a whole lot," and offers expert testimony to show that 450 metric tons of canola seed and 220,000 bushels of soybeans only

amount to a few days of operation for a biofuel plant of Absolute's claimed production volume. However, this distorts the scope of the duties SCB owed to Petro–Diamond and attempts to elevate Silin's duty into one that rivals that of a highly specialized and experienced expert, instead of that of an unsophisticated RINs trading broker. At the time the transactions occurred, Silin was a recent college graduate with an entrepreneurial studies background. (Silin, April 22 PM, 63:8–18.) He had begun working at SCB in October 2009, which amounted to his first exposure to brokering and to the renewable fuels industry. (*Id.*, 63:19–64:10.) At no point in time did Silin hold himself out to Pascu or anyone else at Petro–Diamond as someone who was capable of converting feedstock volumes into renewable fuel and RIN production. (*See* Silin, April 23 PM, 24:14–17 ["There was no way that I would know that type of information," referring to his inability to determine how much biodiesel could be produced from feedstock volume].) Particularly given the relative sophistication of the parties, Pascu could have simply inquired more specifically as to what "a whole lot" meant. Had she done so, Silin could have told her the exact feedstock volumes, and Pascu could have made her own inferences and calculations from there. What a reasonable commodities trader would *not* have done is interpret her broker's use of the phrase "a lot" of feedstock to stand for any definitive, expert conclusion about biodiesel production.[11]

At the time Silin made his statement, SCB had brokered a $270,000.00 transaction for 450 metric tons of canola seed for Absolute. SCB had also brokered a transaction for nearly 220,000 bushels of soybeans for Absolute—a transaction that required three deliveries over a three-month period with the first month's payment alone exceeding $1,000,000.00. (Exh. 3–1–3–3.) The Court does not find, in this context, Silin's characterization of these feedstock amounts as "a lot" to be actionable.

Likewise, the second half of Silin's December 29 statement "so, I mean, you know, [Gunselman] ... he's definitely producing" is reasonably understood as Silin's concluding inference based on the preceding factual premise that Absolute had purchased "a lot" of feedstock. In fact, Pascu and Silin had a previous interaction on November 19 where Silin supplied a similar inference based on a predicate fact— and Pascu demonstrated that she understood such conclusion to be based on Silin's own deductive reasoning and was *not* as a separate and independent assertion of fact. (*See* Exh. 289 [in response to Silin's statement, "[s]o, you know, I—I wouldn't think that if there was something going on there ... he wouldn't be bidding us for [physical product]," Pascu immediately rebuts that Verdeo had also asked for physical product].) In that prior interaction, Pascu acted as a reasonable listener by differentiating Silin's statement of fact (Gunselman bidding for physical product) from his ultimate deduction from that fact, signaled by the word "so" ("I wouldn't think ... there was something going on"). Here, a reasonable listener would have similarly un-

---

11. Pascu makes the further unreasonable extrapolation from Silin's use of the phrase "a whole lot" to mean Gunselman was purchasing an amount of feedstock "commensurate with" the amount of RINS he was selling. (Pascu, April 24 PM, 65:16–66:11.) Silin made no such assertion and his statement does not support such a broad interpretation.

This reading is even more unreasonable in light of the fact that all of the then-outstanding Absolute deals Silin had brokered for Pascu were for B11s, not B10s, which were the only RINs that could have been produced in 2010 when Silin's statements were made. (*See* Pascu, April 28 PM, 56:20–25.)

derstood Silin's statement "so, I mean ... he's definitely producing" to be wholly derivative of the factual representation "he bought a lot" of feedstock. And because the factual predicate that Gunselman bought a lot of feedstock was not inaccurate, Silin's December 29 statement is not actionable.[12]

In sum, the Court does not find that any of Silin's statements were either materially false or misleading due to a material omission. Accordingly, Petro–Diamond has failed to prove that SCB breached its fiduciary duty.[13]

**B**

To prevail on a fraudulent concealment claim, Petro–Diamond must prove by a preponderance of the evidence that (1) SCB concealed or failed to disclose facts it was obligated to disclose to Petro–Diamond; (2) Petro–Diamond did not know of the concealed facts; (3) SCB intended to deceive Petro–Diamond by concealing the fact; (4) had the omitted information been disclosed, Petro–Diamond would have behaved differently; (5) Petro–Diamond was harmed; and (6) SCB's concealment was a substantial factor in causing Petro–Diamond's harm. *See* CACI 1901.

Petro–Diamond has not met its burden in proving the third element of a fraudulent concealment claim: that SCB or Silin had an intent to deceive Petro–Diamond or Pascu. Petro–Diamond argues that Silin induced Pascu to purchase Absolute RINs while knowing all along that the RINs were faulty, and points to the same evidence of allegedly wrongful conduct by Silin that this Court found to be nonactionable. (*See* Pl.'s Post–Trial Br. at 35–36.) For example, Petro–Diamond points to Silin's nondisclosure of Houston Refining's contract cancellation and Durels's inability to verify plant production in Littlefield. But as explained in Part III.A of this Memorandum, the evidence supports a finding that SCB had a good-faith belief that Absolute's RINs were valid, even after the contract cancellation and the Absolute plant visit. In fact, Durels specifically stated that, based on his plant visit, he thought Absolute was legitimate and that he had a "gut feeling" about Gunselman's character as "genuine." (Exh. 426.) And Silin testified that Houston Refining's cancellation was merely the fallout of Fitzgibbon's "trash talk," which had been laid to rest.[14] These are reasonable explanations as to SCB's nondisclosure and do not establish an intent to deceive. Petro–Diamond also cites Silin's

12. In another attempt to impose liability, Petro–Diamond argues that Pascu understood Silin's comment ("he's definitely producing") to be in reference to Durels's visit to the plant. This interpretation again goes beyond what Silin said and is unreasonable given that the statement was made in the context of Gunselman's feedstock purchases, *not* Durels's trip. This argument also tends to undermine Pascu's earlier representation that Silin had left her "with confidence" Durels had seen a producing plant during the alleged December 6 phone call. (*See* Pascu, April 28 PM, 61:9–62:2.) As SCB points out, had Pascu already received such unequivocal reassurances, Silin's comment that Absolute is "definitely producing" on December 29 would have been out-of-place and quite suspect.

13. Petro–Diamond also fails to prove its constructive fraud claim. Under California law, constructive fraud is "a unique species of fraud applicable only to a fiduciary or confidential relationship." *Assilzadeh v. Cal. Fed. Bank*, 82 Cal.App.4th 399, 415, 98 Cal. Rptr.2d 176 (2000). Because Petro–Diamond has not proven a breach of fiduciary duty, which is an essential element of a constructive fraud claim, it cannot prevail on this claim either. *See id.*

14. For the same reason, there is nothing sinister about Silin's reassurance to Gunselman that Total Petro was unlikely to have heard of any "trash talk."

statement about Absolute's feedstock purchases as circumstantial evidence of his bad-faith intent. But, again, Silin's perception of the feedstock purchases as "a lot" was reasonable in light of his background and education. None of the actions Petro–Diamond cites amounted to wrongful conduct, and the Court does not find that SCB's conduct evinces an intent to deceive.

Any argument regarding SCB's supposed fraudulent intent is further belied by the fact that the EPA permitted Absolute to resume transferring RINs after its audit in early 2011. This is significant because it shows that even the regulatory agency in charge of validating all RINs had, at least temporarily, believed Absolute's operations were legitimate after completing an audit. Gunselman's factual resume further confirms that over a dozen companies, including the "majors," were deceived into entering into fraudulent transactions with Absolute. It strains credulity to believe that Silin, a newcomer to the industry, had some secret insight into the actual value of Absolute's RINs or was otherwise privy to the truth of Gunselman's fraudulent scheme. Neither of these theories is substantiated. Because Petro–Diamond has not met its burden of proof on the intent requirement of fraudulent concealment, this claim fails.

## IV

For the foregoing reasons, the Court finds that Petro–Diamond has not met its burden in proving its breach of fiduciary duty, constructive fraud, or fraudulent concealment claims against SCB.